**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SHEENA LIGGETT on behalf of R.M.R., a minor child,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:25-CV-02380-JPC<br><br>JUDGE J. PHILIP CALABRESE<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Sheena Liggett, as legal guardian to minor child R.M.R and on the child's behalf, challenges the Commissioner of Social Security's decision denying childhood supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Nov. 4, 2025). For the reasons below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** for additional proceedings.

## PROCEDURAL BACKGROUND

On October 12, 2023, Ms. Liggett applied for SSI on R.M.R.'s behalf alleging R.M.R. became disabled on January 1, 2021 due to attention deficit hyperactivity disorder (ADHD), major depressive disorder (MDD) with psychotic features, post-traumatic stress disorder (PTSD), generalized anxiety disorder (GAD), sleep disorder, and childhood schizophrenia. (*See* Tr. 95, 241-42). After the claim was denied initially and on reconsideration, Ms. Liggett requested a hearing

before an administrative law judge. (Tr. 94, 109, 131). On October 15, 2024, Ms. Liggett and R.M.R. (represented by counsel) appeared before the ALJ for Ms. Liggett to testify on R.M.R.'s behalf. (Tr. 39-64). On January 14, 2025, the ALJ determined R.M.R. was not disabled. (Tr. 24-38). On September 11, 2025, the Appeals Council denied Ms. Liggett's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. § 416.1481). Ms. Liggett timely filed this action on November 4, 2025. (ECF #1).

## FACTUAL BACKGROUND

### I. Personal Evidence

R.M.R. was born in June 2010. (Tr. 95). Under Social Security regulations, she was a school-age child at all relevant times, in seventh grade when the application was filed and eighth grade as of the ALJ's decision. (*Id.*; *see* Tr. 256).

### II. Educational Evidence

R.M.R.'s seventh-grade science teacher completed a teacher questionnaire in December 2023, provided the teacher's observations of R.M.R.'s functional abilities across six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for herself, and (6) physical well-being. (Tr. 256-62). Her teacher marked that R.M.R. had no observed problems in any of the domains and commented that she "works well with other students," "is always on task [and] polite," and "is often a leader" in group work. (258-60).

### III. Medical Evidence

In April 2021, R.M.R.'s mother sought counseling to address her anger and aggressive behavior. (Tr. 1050). Before then, R.M.R. was in counseling and treatment for oppositional defiant disorder (ODD), ADHD, and PTSD. (*See* Tr. 1052). At the initial assessment, R.M.R.

reported seeing scary people in her bedroom and bathroom. (Tr. 1050). Her mother reported that she struggled to fall asleep, talked about sex often, did not wipe after using the bathroom, and did not regularly bathe, take care of her hair, or brush her teeth. (Tr. 1050-51). R.M.R. admitted she targets her younger brother when she is angry and is sometimes physically violent. (Tr. 1051). She reported preferring to play alone and be by herself. (Tr. 1052).

In fourth grade at the time, R.M.R. did not have an Individualized Education Program (IEP) or a 504 plan but her mother was trying to get her tested. (*Id.*). The counselor documented that R.M.R. was calm and cooperative but became restless and lost interest in the assessment toward the end. (Tr. 1056). She appeared to have average intelligence "but with poor insight and impulse control," "likely due to [her] young age." (*Id.*). The counselor assessed ODD and ADHD and recommended outpatient therapy and case management services. (Tr. 1058). At some point, R.M.R. was prescribed medication to address her mental health symptoms. (*See* Tr. 321). In September 2021, R.M.R. reported sexual abuse (Tr. 1039-40) and was temporarily removed from her mother's care in October (Tr. 1042) and permanently removed in August 2022 for sexual abuse and neglect (*see* Tr. 694). She lived with a foster family and then, in January 2023, she moved in with her aunt, Ms. Liggett, who became her legal guardian. (*See* Tr. 321).

In February 2023, Ms. Liggett took R.M.R. to the emergency department for a psychiatric evaluation after R.M.R. expressed suicidal ideation and homicidal ideation toward her abuser. (*Id.*). R.M.R. reported being off medication for almost a year and experiencing visual and auditory hallucinations. (*See id.*). The provider documented normal attention, depressed mood, flat affect, and cooperative but withdrawn. (Tr. 323). At discharge, R.M.R. denied suicidal and homicidal thoughts. (Tr. 327).

In March, R.M.R. underwent a diagnostic assessment through Access Ohio where she reported a history of depression, suicidal ideation, and hallucinations about "the big scary man" that have decreased since leaving her mother's care. (Tr. 675). She described difficulty getting to sleep and crying spells. (Tr. 683). Ms. Liggett reported R.M.R. has PTSD symptoms, seems to withdraw from other students, and has struggled with focus in school. (*Id.*). The evaluator documented a withdrawn demeanor, average activity, clear speech, logical thought process, apathetic mood (lack of feeling or emotion), and impaired attention and concentration, and noted R.M.R. was expressionless, lacking facial tone, and her emotional tone was inconsistent with the content of her speech and thoughts. (Tr. 682-85). She was diagnosed with PTSD and offered case management, counseling, and psychiatric support services. (Tr. 688).

Days later, R.M.R. met with Jamila Khan, D.O., for an initial psychiatric evaluation where she reported a history of PTSD and sexual assault, occasional mood difficulties, and crying spells. (Tr. 694). Dr. Khan noted "no signs of hyperactive or attentional difficulties," cooperative behavior, good eye contact, normal speech, euthymic and calm mood, appropriate affect, logical thought process, normal thought content, normal cognition, normal insight and judgment, average intelligence, and normal memory. (Tr. 694-95). She assessed ADHD and disruptive mood dysregulation disorder and prescribed Adderall and melatonin for those conditions. (Tr. 695).

In April, Ms. Liggett reported that Adderall improved R.M.R.'s ability to focus and requested a mood stabilizer. (Tr. 696). Two weeks later, Ms. Liggett reported the mood stabilizer, Abilify, was too sedating, so Dr. Jamila prescribed Latuda instead. (Tr. 697). In May, Ms. Liggett reported R.M.R. was "kind of tired" when taking Latuda and was generally "not good," exhibiting oppositional behavior and occasionally endorsing feelings of sadness. (Tr. 698). Dr. Jamila

prescribed a trial of Zoloft, an antidepressant, that improved R.M.R.'s mood (Tr. 698-99). In June, Ms. Liggett reported daytime sleepiness from Zoloft. (Tr. 700). To reduce side effects, Dr. Jamila recommended R.M.R. take the medication at night and also prescribed clonidine to generally improve her sleep. (*Id.*).

In August, R.M.R. underwent another psychiatric evaluation where her aunt reported R.M.R. does not smile, cry, show emotion, regularly bathe, brush her teeth, or clean herself after using the toilet, and she has poor grades. (Tr. 539-40). Ms. Liggett also endorsed R.M.R. yelling and swearing during school when she does not take her ADHD medication. (Tr. 539). R.M.R. reported that she likes school, her classmates, and teachers; becomes afraid when others yell but feels safe living with her aunt; talks and mumbles to herself when she is upset; and used to see a creepy tall figure and hear him speak, but no longer. (Tr. 541). The provider increased Zoloft. (*Id.*).

In another evaluation in September, Ms. Liggett reported R.M.R. was doing well on her medications, with fewer anxiety attacks, and her teacher said she was doing well in school. (Tr. 545). R.M.R. endorsed feeling happy, liking school, showering every day, and sleeping well without nightmares. (Tr. 547). The provider continued her medications. (Tr. 549).

In February 2024, Ms. Liggett switched R.M.R.'s care to a different Access Ohio location, where she reported R.M.R. had not taken her medications for three days and had not slept well since then. (*See* Tr. 786). Ms. Liggett also reported R.M.R. was doing well in school, her mood was stable, and she denied significant depression or anxiety. (*Id.*). Nurse practitioner David Huffman documented "no signs of hyperactive or attentional difficulties," cooperative behavior, normal speech, euthymic and calm mood, appropriate affect, logical thought process, normal thought content, normal cognition, normal insight and judgment, above average intelligence, and normal

memory. (*Id.*). NP Huffman continued her medications. (Tr. 787). During a follow-up appointment, Ms. Liggett reported R.M.R. was doing well overall and in school, her mood was stable, and she denied significant depression or anxiety. (Tr. 788). NP Huffman continued R.M.R.'s medications. (Tr. 789).

Between February 2023 and May 2024, as part of case management services, a qualified mental health specialist (QMHS) met with R.M.R. weekly at her school to provide community support. (*See, e.g.,* Tr. 554-59, 564-77, 581-609, 711-31, 824-36). During these sessions they discussed topics about which Ms. Liggett was concerned, including R.M.R.'s behavior at home and school, her poor hygiene, lying about her grades and taking her medications, refusing to show Ms. Liggett her grade card, downloading inappropriate applications to her phone, and about R.M.R.'s unstable relationship with her parents. (Tr. 566, 581, 585, 591, 600, 717, 727, 824, 826, 828, 830, 836).

In April 2024, Ms. Liggett reported R.M.R. does not take her medication consistently, has problems with concentration and focus, has emotional outbursts, and does not follow a routine. (Tr. 767). NP Huffman increased clonidine to address poor sleep. (Tr. 791). In May, R.M.R. reported improved sleep with clonidine, denied significant depression or anxiety, and endorsed compliance with medications. (Tr. 792). NP Huffman documented the same findings on mental status examination as in February (*compare* Tr. 792 *with* 786) and continued R.M.R.'s medications (Tr. 793). In August, Ms. Liggett reported R.M.R. struggled to understand easy concepts and build relationships and her grades were low, but she was doing well overall and her moods were stable. (Tr. 999). NP Huffman continued her medications. (Tr. 1000).

In September, Ms. Liggett talked with R.M.R. about her poor grades. (*See* Tr. 1011). The conversation upset R.M.R. because she did not realize her grades were so low. (*Id.*). Still upset, the next morning R.M.R. hit Ms. Liggett, then pregnant, in the stomach. (*Id.*, *see also* Tr. 997). R.M.R. was charged with a felony and released to her grandmother's care on September 18. (*See* Tr. 1027-28). That day, Ms. Liggett discussed the incident with NP Huffman and her concern that R.M.R. was lying about taking her medication. (Tr. 997). She requested medication to address R.M.R.'s "mood and anger." (*Id.*). NP Huffman stopped Zoloft and Adderall, continued clonidine, and prescribed Abilify. (Tr. 998).

On September 23, 2024, R.M.R. was enrolled in a partial hospitalization program for evaluation and treatment of depression and anxiety. (Tr. 1027). During the program R.M.R. reported "struggling the most with anger," and denied suicidal and homicidal ideations, hallucinations, and delusions. (Tr. 1011). Ms. Liggett participated in R.M.R.'s treatment and reported that before the incident R.M.R. "seemed like she was doing well but started to have mood changes" and stopped taking her medication consistently. (Tr. 1012). She described R.M.R. as "loud and rude at school," but quiet at other times. (*Id.*). Ms. Liggett stated that R.M.R.'s focus was "kind of off" without Adderall and she stopped Abilify after a few days but has been calm when visiting with her. (*Id.*). Ms. Liggett completed a symptom checklist, endorsing R.M.R. as having difficulty following through on instructions, difficulty organizing, easily distracted and forgetful, fidgeting, lying, bullying and threatening others, arguing with adults, refusing to obey, blaming others, anger and resentfulness, having little confidence, and poor school grades. (*Id.*). By October 1, R.M.R. was noted to be doing well on medication. (Tr. 1025). She participated in group, individual, and family therapy, interacted well with others, and was engaged during group

discussions and activities. (Tr. 1028). Treatment notes indicate R.M.R.'s cognitive function was appropriate for her age, she learned and applied coping skills, and better regulated her emotions during the program. (*Id.*). She successfully completed the program on October 8 and reported "her depression, anxiety, and anger were 'good.'" (Tr. 1027-28).

**IV. Opinion Evidence**

On January 8, 2024, state agency psychological consultant George A. Bokelberg conducted the initial review. After summarizing the evidence, Dr. Bokelberg found R.M.R. had severe impairments that did not meet, medically equal, or functionally equal any listed impairment. (Tr. 97-99). He then found R.M.R. a "less than marked" limitation for attending and completing tasks, interacting and relating with others, and caring for yourself, and no limitation in acquiring and using information, moving about and manipulating objects, and health and physical well-being. (Tr. 98-99). He concluded that R.M.R.'s reported symptoms were only partially consistent with the medical evidence. (Tr. 99). Dr. Bokelberg acknowledged reported difficulties with hygiene but noted R.M.R. was not in special education, was getting good grades, a Teacher Questionnaire indicated no problems in any functional domain, she reported being stable on medication, and a recent mental status examination was unremarkable. (Tr. 100). On May 1, 2024, state agency psychological consultant Irma Johnston, Psy.D., adopted the same limitations on reconsideration review. (Tr. 105-06).

**V. Testimonial evidence**

About two months into R.M.R.'s eighth-grade school year, Ms. Liggett testified before the ALJ about R.M.R.'s history and conditions. Ms. Liggett described R.M.R.'s abusive and transient home life before she volunteered to take custody, including abuse, removal from her mother's home, and issues with placement in other homes. (Tr. 48-49). Ms. Liggett took custody of R.M.R.

two years before the hearing so R.M.R. was not placed into foster care. (*Id.*). She testified R.M.R. is on probation for a misdemeanor conviction for punching her in the stomach one morning before school. (Tr. 47-48).

Ms. Liggett described R.M.R.'s symptoms from PTSD, including nightmares, hallucinations, fidgeting, and regression in hygienic routines. (Tr. 49). She also reported that R.M.R. does not show emotion. (Tr. 58). She struggles to bathe regularly, requiring Ms. Liggett to reteach and remind her how to wash her hair and brush her teeth. (Tr. 51).

Ms. Liggett is working to get R.M.R.'s school to evaluate her for an IEP. (Tr. 51). R.M.R. has not repeated a grade in school but presently has trouble focusing, a problem reflected in her poor grades (four F's, one D, one C, and one A). (Tr. 51-52). In seventh grade, reports from her teachers described her as being disruptive, including yelling out, putting her feet on the desk, and not doing as she was told. (Tr. 56). Ms. Liggett was not aware of similar issues occurring in R.M.R.'s eighth-grade year. (Tr. 55-56). Not long before the hearing, R.M.R. was prescribed Concerta, an ADHD medication. (Tr. 55).

Ms. Liggett testified that R.M.R. says she has some friends at school but does not have a social life outside the school environment and does not go anywhere or invite anyone over. (Tr. 56). She is not interested in sports or other after-school activities, preferring to watch television by herself and draw. (Tr. 58). Ms. Liggett must repeatedly ask R.M.R. to do chores because sometimes R.M.R. will not pay attention or gets moody and refuses to, for instance, go to the doctor, take a bath, or come out of her room. (*Id.*).

## STANDARD FOR BENEFITS

An individual under the age of 18 is "considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(C)(i).

Because R.M.R. is under the age of 18, the familiar five-step sequential analysis does not apply. Instead, children's disability claims are evaluated under a three-step sequential analysis. *See* 20 C.F.R. § 416.924(c). At Step One, a child must not be engaged in "substantial gainful activity." *Id.* § 416.924(b). At Step Two, a child must have a medically determinable impairment or combination of medically determinable impairments that is "severe." *Id.* § 416.924(c). If the child does not have an impairment or combination of impairments that is severe, then the child is not disabled. *Id.* If the claimant has a severe impairment, then the ALJ proceeds to Step Three. *Id.*

At Step Three, the child's severe impairment must meet or medically equal the criteria of a relevant listing. *Id.* § 416.924(d). In deciding that issue, the ALJ must consider the combined effect of all the child's medically determinable impairments, including those that are not severe. *Id.* §§ 416.923, 416.924a(b)(4), 416.926a(a), (c). An impairment or combination of impairments meets or medically equals a listing if the impairment or combination of impairments results in two "marked" limitations or one "extreme" limitation over four functional area. *See* Listing 112.00, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 112.00(A)(2)(ii).

If the child's severe impairment does not meet or medically equal a relevant listing, then the ALJ "will decide whether it results in limitations that functionally equal" a relevant listing.

20 C.F.R. § 416.924a(a). In determining whether an impairment functionally equals a listing, the ALJ must assess the child's functioning in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. *Id.* § 416.926(b); *see also* Social Security Ruling (SSR) 09-1P, 2009 WL 396031 (Feb. 17, 2009). To functionally equal the listings, the claimant's impairment(s) must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id.* §§ 416.926a(b)(1), (d).

## THE ALJ'S DECISION

The ALJ found that on both the application date and the date of the decision R.M.R. was a school-age child within the meaning of 20 C.F.R. § 416.926a. (Tr. 28). At Step One, the ALJ determined R.M.R. had not engaged in substantial gainful activity. (*Id.*). At Step Two, the ALJ identified "depressive, anxiety, adjustment, attention deficit hyperactivity, post-traumatic stress, and disruptive mood dysregulation disorders" as severe impairments. (*Id.*).

At Step Three, the ALJ first determined R.M.R.'s impairments did not meet or medically equal the severity of a relevant mental disorder listing. (*Id.*). The ALJ discussed Listings 112.04 (depressive, bipolar and related disorders), 112.06 (anxiety and obsessive-compulsive disorders, 112.11 (neurodevelopmental disorders), and 112.15 (trauma and stressor-related disorders) and found R.M.R. did not meet the requirements because she did not have one "extreme" limitation or two "marked" limitations over four areas of functioning. (Tr. 28-29).

The ALJ then determined R.M.R.'s impairments did not "functionally equal" a relevant listing because she had no "marked" or "severe" limitations across six identified domains of functioning, short of the required two "marked" limitations or one "extreme" limitation across

those six domains. (Tr. 29-33). The ALJ then concluded R.M.R. was not "disabled," as defined by the Social Security Act. (Tr. 33).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec*., 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec*., 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by

the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

First, Ms. Liggett seeks remand under Sentence Six of 42 U.S.C. § 405(g) because the Appeals Council erred in not admitting R.M.R.'s additional education records and rejecting her request to review the ALJ's decision, and the ALJ did not fulfill his duty to develop the record when he did not request the education records himself. (ECF #9 at PageID 1160). Second, Ms. Liggett claims the ALJ did not properly evaluate the state agency psychological consultants' opinions or the functional domains. (*Id.* at PageID 1177). I address each argument in turn.

**I. Remand under Sentence Six is not warranted.**

During the administrative hearing in October 2024, the ALJ noted the absence of school records in the file and agreed to hold the record open for 14 days after the hearing for R.M.R.'s counsel to submit education records. (Tr. 52-53, 64). In a post-hearing letter to the ALJ dated October 29, R.M.R.'s counsel requested 14 more days to obtain evidence from R.M.R.'s school. (Tr. 314). Those records were not submitted for review (*see* Tr. 34-38) and the ALJ issued his decision on January 14, 2025 (Tr. 24-33). That same day, R.M.R.'s school held a meeting to develop an IEP for R.M.R. (*See* Tr. 7). On January 29, 2025, Ms. Liggett requested the Appeals Council review the ALJ's decision and attached documentation from the IEP meeting. (Tr. 315-18). The Appeals Council reviewed the records, determined there was not a reasonable probability that the evidence would change the outcome of the ALJ's decision, and denied Ms. Liggett's request for review. (Tr. 1).

Ms. Liggett contends the Appeals Council "was required to review and remand the case" because the education records are new, material, and relate to the period on or before the date of the hearing decision, and there is a reasonably probability that those records would change the outcome of the ALJ's decision. (ECF #9 at PageID 1174).

Where the Appeals Council considers new information but declines to exhibit that evidence and to review the ALJ's decision, as is the case here, a district court may not consider that evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). But the court can remand the case for further administrative proceedings under Sentence Six of § 405(g) to consider that evidence if the claimant shows the

evidence is new and material, and that there was good cause for not presenting the evidence before the ALJ issued his decision. *Id.* at 696.

Evidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). And evidence is material only if there is a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence. *Sizemore v. Sec'y of Health & Hum. Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). A claimant shows good cause by demonstrating a reasonable justification for not acquiring and presenting the evidence for inclusion in the hearing before the ALJ. *Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (1984) (per curiam). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter v. Comm'r of Soc. Sec.*, 479 F.App'x 713, 725 (6th Cir. 2012). Instead, the claimant must provide "a valid reason for [her] failure to obtain evidence prior to the hearing." *Oliver v. Sec'y of Health & Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986), citing *Willis*, 727 F.2d at 554. That includes "detailing the obstacles that prevented the admission of the evidence." *Bass v. McMahon*, 409 F.3d 506, 513 (6th Cir. 2007).

The IEP record is new given that it was created the same day the ALJ issued his decision, approximately three months after the administrative hearing. And Ms. Liggett's testimony at the hearing about her efforts to get the school to evaluate the child for an IEP and the obstacles she faced likely establish good cause. But Ms. Liggett has not shown materiality.

Ms. Liggett contends the records are material because the ALJ told R.M.R.'s counsel he "would be interested in" grades and attendance records and agreed to hold the record open for 14 days for counsel to submit that information. (ECF #9 at PageID 1172) ("This shows the records

were important, and the absence of the record affected the outcome of the decision."). Ms. Liggett overreads import of the ALJ's comments. During the hearing, Ms. Liggett testified the claimant has trouble focusing in school and has failing grades in most subjects. (Tr. 51-52). The ALJ noted the absence of school records in the file (Tr. 52) and agreed to keep the record open for counsel to provide them (Tr. 64). The ALJ did not suggest or indicate that failing grades would, in conjunction with the other evidence, support a finding that R.M.R. is disabled. Moreover, even if the Court agreed that the ALJ's interest in that evidence shows a reasonable probability that the ALJ would have reached a different outcome if presented with evidence verifying R.M.R.'s failing grades, that is not the evidence that was provided to the Appeals Council.

Instead, Ms. Liggett submitted the results of R.M.R.'s initial IEP meeting in which testing results indicate she has "challenges in performing everyday tasks and activities necessary for personal and social sufficiency," average scores in reading and writing, and low scores in mathematics. (Tr. 8). The IEP record also indicates R.M.R. would receive accommodations including flexible seating, five-minute breaks for every hour of testing, small group assessments, redirection to task, repeated directions, and extended time on assignments and assessments, with all services to be provided in a general education setting alongside her peers. (Tr. 15-16, 19). The IEP does not provide insight into the child's grades, attendance, or in-school behavior.

In her brief, Ms. Liggett does not address the contents of the IEP or explain how it shows a reasonable probability that the ALJ would have found R.M.R. disabled if that evidence was part of the record. Instead, she appears to rely solely on the existence of the IEP, claiming the fact that there is an IEP contradicts the ALJ's reliance on the claimant "receiving instruction 'in an unassisted and unaccommodated mainstream curriculum in a regular classroom setting.'" (ECF #9

at PageID 1176). She also contends the IEP contradicts the state agency consultants' opinions concerning two of the six functional domains for evaluating childhood disability. The consultants found no limitation in acquiring and using information, noting the child was not in special education and her grades are good. (*Id.*, referring to Tr. 98, 105). And the consultants found a less than marked limitation in attending and completing tasks, again noting the child was not in special education. (*Id.*, referring to Tr. 99, 105).

In some cases, the mere existence of an IEP suggests a reasonable probability that the ALJ would have reached a different conclusion if he had considered it. For instance, in *Ellis v. Comm'r of Soc. Sec.*, No. 12-15112, 2014 WL 1514590 (E.D. Mich. Apr. 2, 2014), the district court held that the existence of an IEP established materiality:

> The plaintiff contends that the report is relevant not because of its contents, but because it exists at all. The plaintiff points out that the ALJ "lamented" [in a decision issued in August 2011] that there was no evidence in the record showing the existence of any special education arrangements for the plaintiff's child, and the fact that an IEP was prepared on November 10, 2010 shows evidence that such arrangements were made. The plaintiff further argues that the existence of the IEP contradicts the ALJ's conclusion that there was no evidence that the plaintiff's son ever was placed into special education, as his mother testified. According to the plaintiff, the existence of the IEP suggests a reasonable probability that the ALJ would have reached a different conclusion if he had considered it.
>
> * * *
>
> The plaintiff testified at the administrative hearing that her son behaved in a manner that might establish marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for oneself. However, the ALJ found that although "the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms," the plaintiff's descriptions "are not credible to the extent that they are inconsistent with" the ALJ's findings. And it is apparent that the ALJ relied heavily on the lack of corroboration in his assessment of credibility. Of course, when assessing credibility the ALJ may consider whether a claimant's statements are substantiated by other evidence in the record—or the absence of such evidence. But if subsequent evidence demonstrates that the ALJ's reliance is wrong because of a

> mistaken belief about the absence of corroborating evidence, there is a "reasonable probability" that he may have reached a different decision if his misapprehension were set straight by the actual facts.

*Id.*, 2014 WL 1514590, at *3 (citation omitted).

In this narrow circumstance, the existence of an IEP established materiality. The claimant's mother testified at the hearing that claimant was placed in special education but she did not submit school records to support that assertion. The ALJ found the mother's testimony not credible to the extent her statements were inconsistent with the ALJ's findings (*i.e.*, no evidence of placement in special education). The existence of the IEP showed the ALJ was mistaken about the absence of that evidence. Because the very existence of the IEP substantiated the testimony from the claimant's mother, the court determined there was a reasonable probability the ALJ may have found her statements consistent with the evidence and therefore reached a different conclusion on the outcome of the case.

Th present case is factually distinguishable from *Ellis*. Here, there was no IEP in place before the ALJ issued his decision, so there is no similar concern that the ALJ was under a mistaken belief about the IEP. Accordingly, Ms. Liggett has not shown the IEP report is material to the ALJ's decision and thus I recommend the District Court deny her request for remand under Sentence Six.

Ms. Liggett also contends the ALJ erred in not obtaining the school records himself, citing the ALJ's "duty to develop the record and conduct a full inquiry into the merits of the case." (ECF #9 at PageID 1175-76) ("Regardless of Plaintiff's hearing attorney's difficulties obtaining the education records timely, the ALJ should have made independent requests pursuant to the regulations to obtain the records, and the failure to do so is error.").

An ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *Lashley v. Sec'y of Health & Hum. Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983) ("The social security hearing examiner furthermore does not act as counsel. He acts as an examiner charged with developing the facts.") (citing *Richardson v. Pearles,* 402 U.S. 389, 410 (1971)); *see also Heckler v. Campbell*, 461 U.S. 458, 470 (1983). In fulfilling that duty, the ALJ will make "every reasonable effort to help" the claimant to obtain records from the claimant's medical sources and entities that maintain relevant evidence. 20 C.F.R. § 416.912(b)(1). That duty is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability). There is a special, heightened duty requiring the ALJ to develop the record when the claimant is (1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures. *Wilson v. Comm'r of Soc. Sec.*, 280 F.App'x 456, 459 (6th Cir. 2008). And in some circumstances, the ALJ's pledge to obtain other records may work to impose a similar duty to gather evidence on the claimant's behalf. The Sixth Circuit has found "a special duty to obtain records" when the ALJ determines the missing evidence is important to resolve the claim and commits himself to obtaining the records. *Strang v. Comm'r of Soc. Sec.*, 611 F.App'x 271, 275-76 (6th Cir. 2015) (finding the ALJ effectively deprived claimant of a full and fair hearing and remanding when the ALJ told claimant that she would obtain records that could have been significant to the evaluation

on his behalf but did not follow through). When the ALJ imposes that duty on himself, he "must obtain the records or at least explain their absence." *Id.* at 275.

After reviewing the record, it is clear the ALJ did not have a duty to obtain R.M.R.'s school records before issuing his decision. R.M.R. was represented by counsel at the administrative hearing and so the ALJ was not under any heightened duty to assist Ms. Liggett in developing the record. The ALJ fulfilled his duty to make reasonable effort to develop the record by allowing Ms. Liggett more time to gather the information. *See Robertson v. Comm'r of Soc. Sec.*, 513 F.App'x 439, 441 (6th Cir. 2013) (holding the ALJ did not err by failing to obtain medical records in part because the ALJ made a reasonable effort to obtain the records by granting counsel extra time to obtain them). The ALJ did not impose a special duty on himself to obtain records on R.M.R.'s behalf; indeed, Ms. Liggett's counsel affirmatively took on the task of obtaining records from the school and did not request the ALJ's aid. (*See* Tr. 54-55). And finally, Ms. Liggett does not point to case law or regulations requiring the ALJ to redouble claimant's efforts to obtain additional evidence supporting her claim. I find no reason to recommend the District Court remand on this basis.

**II. The ALJ erred in evaluating the state agency consultants' opinions.**

In her second assignment of error, Ms. Liggett combines two arguments. First, she argues the ALJ did not comply with the revised regulations in evaluating the state agency psychological consultants' opinions. (ECF #9 at PageID 1177). Second, she concedes the ALJ summarized the relevant treatment notes and medical evidence but argues the ALJ did not draw sufficiently explained conclusions from that evidence and therefore "failed to build an accurate and logical bridge from the evidence to the finding that [R.M.R.] had less than marked limitations in the

[functional] domains." (*Id.* at PageID 1179-80). Because the first argument is controlling and warrants remand, there is no need to reach the second.

In assessing the claimant's RFC, the ALJ must review all medical opinions and prior administrative findings and *explain* how persuasive he finds them. *See* 20 C.F.R. § 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R §§ 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinion," the two most important factors. *See id.* § 416.920c(b)(2). The ALJ's supportability analysis should address the evidence and justifications the medical professional cites in support of his own conclusions. *See Crystal E.J. v. Comm'r of Soc. Sec.*, No. 2:21-cv-4861, 2022 WL 2680069, at *7 (S.D. Ohio Jul. 12, 2022), *report and recommendation adopted,* 2022 WL 2974734 (S.D. Ohio Jul. 27, 2022). The consistency analysis compares the medical opinion at issue with evidence from other sources. *Ford v. Comm'r of Soc. Sec.*, No. 1:22-CV-00524, 2023 WL 2088157, at *17 (N.D. Ohio Jan. 31, 2023), *report and recommendation adopted,* 2023 WL 2080159 (N.D. Ohio Feb. 17, 2023). The ALJ's explanation should "generally include[ ] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the

ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability, and substantial evidence supports the discussion, then the reviewing court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted,* 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Here, after noting that no medical or educational provider opined that R.M.R.'s symptoms result in marked or extreme limitations, the ALJ determined that "while the claimant's mental impairments do result in functional limitations in domains (2) [attending and completing tasks], (3) [interacting and relating with others], and (5) [care for herself], as alleged, the longitudinal medical evidence and record as a whole continues to support the conclusions of State agency psychological consultants, and those consistent prior administrative findings remain persuasive." (Tr. 32).

I find the ALJ's analysis lacking. First, the ALJ's conclusory statement provides no analysis of the extent to which the state agency consultants supported their opinions with citations to objective medical evidence and explanations (*i.e.*, supportability), even though both consultants summarized the evidence available to them and provided explanations, albeit briefly, to support their opinions. (*See* Tr. 97-99, 104-06). And while the ALJ invokes the term "consistent" he offers no insight into how the unspecified "longitudinal evidence" is consistent with the consultants' opinions. The ALJ's unexplained conclusion, standing alone, does not meet the minimum articulation requirement to explain how he considered the factors of supportability and consistency. But that is not the end of the analysis.

District courts within the Sixth Circuit, citing an unpublished Sixth Circuit opinion, have found that "the ALJ may rely on information articulated elsewhere in his decision to support a persuasiveness finding and need not rearticulate such information in his analysis." *Thornsley v. Comm'r of Soc. Sec.*, No. 5:24-cv-1145, 2025 WL 1702944, at *16 (N.D. Ohio June 18, 2025) (citing *Crum v. Comm'r of Soc. Sec.*, 660 F.App'x 449, 457 (6th Cir. 2016)), *report and recommendation adopted*, 2025 WL 2217714 (N.D. Ohio Aug. 5, 2025). In *Crum*, the claimant's treating physician indicated the claimant would miss work four to five days a month and could stand or walk for two hours in an eight-hour workday. 660 F.App'x at 456. The Sixth Circuit determined the ALJ properly addressed the supportability of the physician's opinion, noting the ALJ's explanation that the opinion was formed based on one recent examination and the last examination showed the claimant was not compliant with recommended diagnostic testing. *Id.* at 457. As to consistency, the ALJ explained the physician's opinion "is not consistent with past treatment records." *Id.* The Sixth Circuit determined this statement was sufficient because "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records that showed the claimant could return to normal work activity," pointing to the ALJ's description of a number of medical records showing the claimant's physical examinations were normal and he "could return to full activity" and was "in overall good health." *Id.* By contrast, a conclusory statement about the persuasiveness of a medical opinion is not sufficient when the ALJ's discussion of the medical evidence is merely a rote recitation of the longitudinal history that does not explain how the medical evidence supported the ALJ's conclusions concerning the functional domains. *See Camacho v. Comm'r of Soc. Sec.*, No. 1:17-cv-222, 2017 WL 6403076, at *12 (N.D. Ohio Dec. 5, 2017).

In this case, the ALJ considered evidence of R.M.R.'s ability to function at home, at school, and in the community, noting she has some maladaptive behaviors, including some physical and verbal outbursts, being a distraction in class, not consistently attending to her hygiene, and lying, while at the same time she was actively involved in her treatment, learning proper cleaning skills, doing her chores, attending cosmetology club meetings after school, and was stable on her medications. (Tr. 30-31). The ALJ then considered the report from R.M.R.'s teacher that R.M.R. has no problems in any of the six functional domains, "works well with other students," and is "always on task and polite." (Tr. 31). The ALJ noted R.M.R. continued to occasionally lie, yell at Ms. Liggett, and not do her chores, but treatment notes show R.M.R. "appropriate[ly] respon[ded] to the 'changes' made by Ms. Liggett to address these behaviors." (*Id.*). The ALJ documented some behavioral issues in March 2024 including being disrespectful when staying with her grandparents and making a rude gesture at the bus driver, and noted that in April 2024 R.M.R.'s difficulties were limited to acting out in class at school and having some outbursts and not routinely completing chores at home. (Tr. 31-32). Moving into July 2024, the ALJ looked at treatment notes showing R.M.R. was doing well overall, her moods were stable, and clinical findings were unremarkable, despite Ms. Liggett's belief that R.M.R. had "a hard time grasping ideas and information." (Tr. 32).

The ALJ then discussed the incident when R.M.R. punched Ms. Liggett the morning after they discussed R.M.R.'s poor grades, noting Ms. Liggett's report that R.M.R. was not taking her medications consistently. (*Id.*). The ALJ emphasized that during the partial hospitalization program, R.M.R. "responded well to group therapy," engaged well with others in the group, "demonstrated [the] ability to identify and implement coping skills," and successfully completed

the program. (*Id.*). Last, she took note of Ms. Liggett's testimony at the hearing that R.M.R. currently has poor grades, is not completing her work, does not have friends and refuses to engage in social activities, and has deficits in coping and anger management skills. (*Id.*). As Ms. Liggett noted, absent from the ALJ's description of the medical record is any analysis about how those findings support his conclusion that R.M.R. is less than markedly limited in attending and completing tasks, interacting and relating with others, and caring for herself, effectively distinguishing this case from *Crum.*

The Commissioner concedes the ALJ did not "reference supportability specifically," but contends the ALJ adequately considered the supportability factor because he reviewed the same records as the consultants and reached the same conclusions in the functional domains as they did. (ECF #10 at PageID 1197) (citing *Guthrie v. Comm'r of Soc. Sec.*, No. 3:22-CV-1309, 2023 WL 6258259, at *3 (N.D. Ohio Sept. 26, 2023) ("[T]hough the ALJ did not use "supported by the evidence cited," "unsupported by the evidence cited," or a similar phrase to explicitly flag that she was discussing the supportability factor, it is clear from the detailed description of the record evidence to which the state psychologists had access that the ALJ did review that evidence and its relevance to Plaintiff's RFC.")). Relatedly, the Commissioner argues the ALJ need not connect the evidence to the individual domains, and that it is sufficient that the ALJ "set forth a lengthy description of the evidence and then summarized his conclusions as to the level of limitation found in each domain." (*Id.* at PageID 1198). Neither argument is persuasive.

True, the ALJ summarized much of the same medical evidence the state agency consultants considered on initial review and reconsideration and his domain conclusions mirrored the consultants' opinions, but the ALJ did not weigh, consider, or explain how the evidence supports

his conclusions in the domains at issue. It is only with the aid of the ALJ's factual findings (like "unremarkable clinical findings do not support a marked limitation in the domain of attending and completing tasks") that a court can connect the dots between particular pieces of medical evidence and an ALJ's conclusory statement that a medical opinion is well-supported. *See Shawn C. v. Comm'r of Soc. Sec.*, 1:25-cv-705, 2026 WL 2500517 (S.D. Ohio Aug. 26, 2026). Otherwise, a court is hard-pressed to assess whether and how the ALJ performed the analysis 20 C.F.R. § 416.920c requires.

In the end, the ALJ did not explain how he considered the supportability and consistency of the state agency consultants' opinions. And because the ALJ's summary of the evidence did not weigh, consider, or explain how the evidence supports his conclusions about the functional domains, the Court cannot meaningfully review the ALJ's assessment of the state agency consultants' opinions, warranting remand.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** the matter for further proceedings.

Dated: October 2, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).